KB5LTREO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LANCE TREANKLER, *et al*,

                Plaintiffs,

          v.                              19 Civ. 629 (RA)


FERROGLOBE, PLC, *et al*,

                                **Oral Argument (Teleconference)**

                Defendants.

------------------------------x

                                        New York, N.Y.
                                        November 5, 2020
                                        3:00 p.m.

Before:

                    HON. RONNIE ABRAMS,

                                        District Judge


                        APPEARANCES

GLANCY PRONGAY & MURRAY LLP
        Attorneys for Plaintiffs
BY:  KARA WOLKE
     GARTH AVERY SPENCER

ALLEGAERT BERGER & VOGEL LLP
        Attorneys for Defendants
BY:  PARTHA PRATIM CHATTORAJ
     RACHEL BRYANT

KB5LTREO

THE COURT:  Good afternoon, everyone.  This is Judge Abrams.

So we're here for oral argument in the motion to dismiss in In re:  Ferroglobe.

Can the lawyers please state their appearances for plaintiffs?

MS. WOLKE:  Your Honor, this is Kara Wolke, from Glancy Prongay & Murray, for the plaintiffs.

THE COURT:  All right.  Good afternoon.

MS. WOLKE:  Good afternoon.

MR. SPENCER:  Garth Spencer, also from Glancy Prongay & Murray, for the plaintiffs.  Not appearing today, just listening in.

THE COURT:  All right.  Good afternoon.

MS. BRYANT:  Your Honor, this is Rachel Bryant, appearing for the plaintiffs *(sic)*.  Partha Chattoraj is also attorney for the plaintiffs.

THE COURT:  All right.

Anyone else on behalf of the plaintiffs?

MR. CHATTORAJ:  Yes.  This is Partha Chattoraj.  I'll be speaking on behalf of the plaintiffs.

THE COURT:  Okay.  Anyone else on behalf of plaintiff here today?  All right.

MS. WOLKE:  Sorry, your Honor.  I think those appearances were on behalf of defendants.

KB5LTREO

MS. BRYANT: Oh. Yes.

THE COURT: Okay. Yeah. I thought my appearance sheet was wrong. But, all right.

Are we ready to begin?

MR. CHATTORAJ: Ready for defendants, your Honor.

THE COURT: Okay. All right. So, first, I want to thank y'all for appearing remotely. I also just want to remind everyone that this is a public proceeding, so the members of the public and press are able to access the proceeding through the public call-in number, the same one that you all used, but all participants and listeners are reminded that any rebroadcasting or recording of any portion of this proceeding is strictly prohibited.

So why don't we start with defendants. It's your motion so why don't we start with you.

MS. PANG: Certainly, your Honor. Thank you very much. Again, this is Partha Chattoraj, from Allegaert Berger & Vogel, for the defendants, Ferroglobe, Phillip Murnane, and Pedro Larrea.

This is a consolidated securities class action. We have referred to it repeatedly as a "stock drop case" in our papers. And I understand, your Honor, that a lot of defendants in securities class actions say that this is a classic stock drop case. This is really an unusually thin complaint. As we've set out in our papers, there are no specific facts that

KB5LTREO

give rise or strong inference of scienter.  What we have is a temporal proximity argument which is, standing alone, not sufficient based on the case law that we've cited.  But I thought that what might be useful, unless the Court has any questions for me at the outset, would be for me to walk through the falsity argument, because I realize that there are a lot of pages of papers that are attached to the declaration.  We are clearly entitled to rely on documents that are referenced in the complaint and upon which the allegations of the complaint depend.  So we've attached slides of these presentations that the gravamen if not the only sort of alleged misrepresentations that the plaintiff has alleged.  And I thought it might be useful to walk through some of these and explain what exactly -- what we actually told investors in these presentations.

Now, the case law is clear -- including Omnicare, the Supreme Court case -- that we can also rely on plenty of safe harbor language and identification of risk factors that are set forth in our 20-F filing with the SEC, and in our previous SEC filings, including with respect to the current period that's at issue in the case.  Those identify all of the risk factors that are at issue here.  But I'm not going to focus on those, although those are attached to my declaration in support of our provisional motion to dismiss on behalf of Ferroglobe. Instead, I'll turn to the slides.  And we can start with the November presentation.  And the reason I do that -- this is

Exhibit 5 to my declaration.  The reason I do that is because plaintiffs argue that we must clearly have been on notice of facts that were ultimately disclosed in our quarterly report because of the period of time between these slides and the quarterly report.  As I said, as a matter of law, that's not sufficient.  But our point on falsity is that these representations are simply not false.

If I could, your Honor, I'd direct you to Exhibit 5 to my declaration and I would start with slide 13, which is -- the statement, "global macroeconomic view remains positive with steady growth forecasted for 2019."  Now, this statement refers to an industry-wide trend, not Ferroglobe's own sales or pricing or volume.  The graph that's on this page shows substantial fluctuation and it refers to a future period, it doesn't refer to the third quarter of 2018.  Similarly, the following slide, which is page 14 of my declaration exhibit, shows, again, a substantial fluctuation in volume over the period of time that includes up through October 2018.  And as you can see, your Honor, the graph shows a steeply decreasing line going from February 2018 to October 2018.  This is, you know, very much inconsistent with the results that were actually reported.  So this is important context for the statements that are being challenged.  This slide also includes a bullet point that says:

"Overhang followed by impact of trade case that lead

KB5LTREO

to surplus inventories by customer in advance of final outcome."

So this is a statement about the trade case that I won't get into too much, unless your Honor has questions about it.  It's events that took place outside the putative class period.  But the point is that, to the extent that plaintiff says that we misrepresented pricing and volume in connection with the result of customers accumulating inventory in connection with that case, this slide, it honestly discloses the information concerning the trade case.  Similarly, the following slide shows numbers for 2018 that are talking about, you know, fluctuations in supply and demand.

THE COURT:  I'm sorry.  Which slide are you focused on now?

MR. CHATTORAJ:  Your Honor, this is slide 15 -- I should say page 15, slide 13.

THE COURT:  All right.  You may proceed.  I got it. Thanks.

MR. CHATTORAJ:  Thank you, your Honor.

Going ahead to the next page and slide, we see the trend line for pricing, for silicon metal pricing in the U.S. -- and, again, silicon metal pricing are the representations the plaintiffs challenged -- going down and, in fact, decreasing below the horizontal line that's shown here for historical averages.  I could go on, and I'm not going to

KB5LTREO

continue this entire presentation with these slides. But the following slide, again, shows prices in Europe and China substantially below historical averages. And so, when you turn to page 18 of the exhibit, which is slide number 16, this is one of the slides that is challenged, where it says "catalyst for near-term pricing recovery." These statements, which are very general in nature, which do constitute opinions, and as to which plaintiff has not adduced any specific fact that show knowledge of falsity, these opinions have to be situated within the larger context of these slides that I just walked through that would give no reasonable investor any belief that we were making representations about future pricing within the third quarter of 2018.

And, you know, when we talk about stock drop cases or the other phrases the defendants always use, fraud by hindsight and so on, this is a situation where we had a price decrease after quarterly results were announced. Plaintiffs have then gone back through a multitude of presentations, filings and so on, and cherry-picked several specific phrases from these slides and said that we committed fraud. That's just not what the PSLRA allows. And so that is sort of the gravamen of our falsity argument.

Your Honor, do you have any questions with that? I could continue with those slides or I could go back to other presentations. But this is more intended to situate our

KB5LTREO

falsity arguments in the context of these presentations.

THE COURT:  That's fine.  I mean, you can keep going. I do want you to address each of the relevant statements.  But why don't you proceed.  I'm hearing you out with respect to context.  So please proceed.

MR. CHATTORAJ:  All right.  Thank you, your Honor.

If you're interested in our response to specific statements, I can do that.  There were five of them.  Let's start with, if we could, the statements that were allegedly made in September in these slides for the earlier presentations.  Again, these statements were made during the third quarter.  There isn't an allegation -- except in a footnote about temporal proximity.  These are just alleged to be knowingly false statements.

The first statement:  "Market fundamentals are accelerating the demands for our products." Now, this is a slide that refers to population growth, urbanization, energy efficiency, and alternative energy and sustainability, among other things.  They're what we call megatrends for the world. The idea that this opinion, this analysis in the context of an industry conference constitutes a material misrepresentation of fact with respect to one specific quarter is just not consistent with the law under the PSLRA.  This is a classic statement of opinion.  It's a person who is involved in the industry making comments about industry-wide trends.

KB5LTREO

Plaintiff takes exception to the use of the word "our product," but this is actually true.  The product that Ferroglobe -- includes silicon metal, as well as aluminum and other metals, and goes beyond that.  This is just a statement about the way in which these global trends tended to improve the long-term picture for these products.  That's not the same thing as a knowing misrepresentation by the company or the individuals concerning a specific quarter.

THE COURT:  Well, why is this not inconsistent with the fact that demand for Ferroglobe's products was declining at the time this statement about accelerating demand for our products was made?

MR. CHATTORAJ:  Your Honor, I freely concede that this slide is not consistent with the factors that went into the fall in pricing.  But the point is that the statements themselves, which refer to population growth, urbanization and so on, are true.  The market fundamentals involved, you know, are, as stated here, correctly.  And they come from third-party sources.

So I would say that the fact that there may have been pricing pressure going on is something that plaintiff hasn't sufficiently alleged that these individuals knew at the time or that the company knew at the time specifically.  And the analysis that the company later offered in a conference call the day after the quarterly results were released was true at

KB5LTREO

that time.  Those are representations that were made at that time.  But that doesn't mean that this statement about market fundamentals was false when made.

Should I --

THE COURT:  All right.  You may proceed.

MR. CHATTORAJ:  Thank you, your Honor.

The next statement was:  "Q2 confirms the strong performance of Ferroglobe in 2018."

And the point is, as we say in our papers, Ferroglobe did show stronger performance in 2018 than its previous year.  In fact, 2018 was Ferroglobe's best year ever.  So it is true, the statement is, again, a true statement.  It doesn't make representations about the third quarter of 2018.  It doesn't -- it's just a general trend statement.  And it's well settled that that sort of general trend statement is permissible under the PSLRA.

THE COURT:  But why is the third-quarter performance not material to discussion about the entirety of the 2018 performance?

MR. CHATTORAJ:  Your Honor, what I would say is that what matters is the statement that's made.  The performance for Ferroglobe in 2018 was strong.  The question of the materiality of the performance for a specific quarter -- especially because there are no misleading statements -- we're getting into the arrow that they focus on and so on.  But there are no

KB5LTREO

misstatements about the pricing and volume in the third quarter in these slides.  It means that the statement isn't intended to mislead investors about a specific quarter.  And I don't think it can fairly be read to do that, because it's talking about 2018 as a whole.

Does that answer your question?  I want to make sure I understand the question.

THE COURT:  You may proceed.  Yeah.

MR. CHATTORAJ:  Thank you, your Honor.

You know, the way that plaintiff sort of addresses these statements to say that we failed, we materially omitted statements about supply, demand, pricing, and the other factors that they identified, such as the availability of aluminum and so on, the truth is that, in context again of this presentation, you know, we have disclosed information that addresses those issues.  But more to the point, we're not required to disclose everything in the world every time we say anything.  That's not the standard.  Again, this is a generalized statement.  It is a true statement.  It's not false.  And the fact that, you know, there are other things that several months later were identified as, you know, factors in the disappointing results for 2018, doesn't really change the fact that these were true when made.  And that's the test.

The next alleged misrepresentation is about the trade case overhang.  You know, this is what we sort of touched upon

KB5LTREO

before.  The reality is that these individuals made statements about their opinion about what was going on with customer inventory as a result of the trade case.  But it had been fully disclosed in the market at the time months before, that pricing was expected to be poor as a result of the trade case, that pricing would have -- that there would be a negative impact on pricing depending on the result of the trade case.  But the result was adverse.  So the issue here was what customers had done with inventory.  And all of a sudden, it seemed to have passed.  As it turned out, they were not correct.  That opinion turned out not to be correct based on the analysis that they provided.  But that is not a false statement when made.  It's simply an opinion about what was going on, you know, with respect to customer inventories.  Any reasonable investor looking at this statement would know that there was substantial pricing uncertainty in connection with the trade case and that obviously Ferroglobe cannot know what third parties are doing.  This is, on its face, an opinion about what's going on.  And, of course, you know, the fact that it being an opinion goes to reliance and, of course, it also has an impact on the scienter analysis.

I'm just skipping ahead.

THE COURT:  Yeah.  Sure.

MR. CHATTORAJ:  I don't want to --

THE COURT:  No.  No.  It's fine.

While we're on the trade case, why, in your view, is the November 27th disclosure not contradictory?  Why doesn't it contradict the statements made in the November 12th presentation?

MR. CHATTORAJ:  The statements made in the November 12th presentation were forward-looking statements that to the extent -- well, first of all, I have -- let me actually take that in a different way.

The November presentation does not contain any statements that are actually false, and that is including with respect to the statements that were ultimately made on November 27th.  For example, the arrow pointing upward in the November presentation, this is a trend line, but in that very graph we see that the pricing is actually going down in the same chart.  Again, a reasonable investor looking at this graph would see that there was no representation being made about the third quarter specifically.  In fact, to the extent a representation was being made, it was anticipating a drop in price.

Similarly -- you know, you'd asked me to address the five alleged misrepresentations -- there is this statement on slide 23.  "Aluminum demand expected to continue delivering steady growth for silicon metal."  This is, again, not a statement that refers to the third quarter.  It says that there was a decrease in demand.  It shows a trend line for 2018, a

KB5LTREO

trend.  So the statements that were made in November 27th, what one might call the analysis of the results post hoc, are fully consistent with the November statements.  The fact that customer inventories were, you know, stated in November 27th to be a factor in the lower pricing doesn't make the statement that the trade case overhang seems to have passed false, because that's just an opinion.  That's just an analysis of what people are speculating might be going on with customer inventories.

So that's my answer to your question, your Honor.  I think that, you know, it's a combination of -- for the most part, there's a complete consistency between the slides on November 14.  And also there is -- you know, to the extent that there's any difference between the trade case statement on November 27th and the trade case statement on November 14th, it's an opinion.

THE COURT:  All right.  You can proceed.  Thanks.

MR. CHATTORAJ:  All right.  I'm ready to move on from the slides and from the alleged misrepresentations to scienter, unless you have any other questions.

THE COURT:  No.  Go ahead.  Thanks.

MR. CHATTORAJ:  Thank you, your Honor.

Now, there's basically two theories that plaintiff advances for scienter.  The first theory is essentially the core operations doctrine, which is a disfavored doctrine, this

KB5LTREO

Court has rejected it repeatedly.  Your Honor, again, noted that it was a weak theory in *Woolgar v. Kingstone Companies, Inc.*, an opinion that you issued on August 10th, 2020.  And that's just the tip of the iceberg.  The reality is it is not appropriate and not consistent with the PSLRA for a plaintiff to allege that simply because an individual is a senior executive, that they must have had scienter, they must have had guilty knowledge.  There needs to be more.

For example, in the cases where scienter has been found, you have insider trading or some other allegation that the individuals in some way benefited from the alleged misrepresentations.  There's nothing like that here.  You have to have allegations of, for example, confidential witness statements or other internal documents that indicate a knowledge of falsity.  You have to have something beyond just the conclusory statement:  This is a senior executive, they must have known.  That just doesn't make it.  So we think that that's quite clear.

The second point is about temporal proximity.  And, again, standing alone, the case law is clear, temporal proximity isn't enough in the absence of some other factual allegation that there is a knowledge of falsity, that there's a knowledge and an intention to defraud.  You can't just rely on temporal proximity, particularly in situations like Ferroglobe, where you have a giant multinational company and there's no

KB5LTREO

reason to draw the inference, unlike in a situation with a small business, that any given executive knows the underlying facts with specificity, you know, weeks before an announcement.

So the next point would simply be that these are classic statements that fall within the PSLRA safe harbor and the bespeaks caution doctrine. As I mentioned earlier, Ferroglobe's SEC filings were replete with identification of risk factors, with, you know, cautions about the market conditions and so on. But in addition to that, each of the presentations the plaintiff challenges includes statutory safe harbor information. It contains the prerequisite language. It cautions investors not to rely on forward-looking statements. And again, in the absence of factual allegations going to scienter -- again, factual allegations, the person is knowingly misleading investors or is being reckless in some way in a level of near criminality, these forward-looking statements are protected. Even absent the PSLRA statutory protection the bespeaks caution doctrine says that an investor cannot reasonably rely on statements like this when there is this kind of disclosure of negative factors. As I indicated at the outset of this call, you know, even the very slides that are challenged by plaintiff show, you know, pricing fluctuating strongly and even going down in the relevant time period.

So there is no basis when you have this kind of detailed disclosure of other things and suggestions of

KB5LTREO

fluctuations and decline to rely. And, again, the scienter issues mean that Section 28 control person liability doesn't exist for the individual defendants, Mr. Larrea and Mr. Murnane.

So I can stop here or we can move on to service. I mean, our position is that the Court should address the issue on the merits without tarrying on the service issues.

THE COURT: That's fine. That's fine. Why don't I hear from plaintiff's counsel next, and then if I have anything else, we can talk about it on rebuttal. Okay?

MR. CHATTORAJ: Thank you, your Honor.

THE COURT: Thank you.

Ms. Wolke, please proceed.

MS. WOLKE: Yes. Thanks, your Honor.

I heard Mr. Chattoraj mention a number of times that this is a case where no reasonable investor could have relied on any of the alleged false statements. And that's just not true. There's a very reasonable investor here, our lead plaintiff, who was misled by defendants' statements during the class period to the tune of over $500,000 in individual losses.

And the standard for alleging falsity -- yes, of course, we have to look at the whole context of statements, but it's whether a reasonable investor would have received a false impression from statements made. And that's from the E*TRADE case. And here, your Honor, I believe that the complaint

KB5LTREO

sufficiently alleges that. And I would also like to take the opportunity to just quickly walk through the slides in the context as we've presented them.

THE COURT: Sure. Sure. I'm happy to do that. Let me just clarify. From your perspective, the statements are misleading due to omissions of material facts, they're not outright false; is that right?

MS. WOLKE: Right. Primarily due to omissions regarding what was happening with pricing and demand during the third quarter, which would have been known to defendants at the time these presentations were made.

THE COURT: Okay. Yeah. So if you walk me through the slides, just tell me which slides you want me to look at while you're discussing it.

MS. WOLKE: Sure. I will. But real quick, I just wanted to start with the context of the trade case.

So the trade was brought in March of 2017 by Ferroglobe, alleging that there were anticompetitive practices with respect to silicon metal dumping against four countries. And so, in anticipation of that trade case, it was anticipated that Ferroglobe would win and that if Ferroglobe won, prices would increase as a result of tightened supply. So the phenomenon was that customers started to stockpile in anticipation of this win. And there was initially a positive determination by the Department of Commerce on March 2nd, 2018.

KB5LTREO

And then the International Trade Court ruled against Ferroglobe on March 23rd, 2018.  So then the initial predictions from analysts following that negative result was that prices were going to drop.  So the whole point of understanding this context is to know that the impact of the trade case fall-out on pricing and demand was at the forefront of the market's interest when defendants were making these representations about quarterly performance and the performance of Ferroglobe in the third quarter.

So the September presentations were all the same; September 4th, 12 and 13th, they gave the same presentation. And I'll start -- I'll just use the September 4th presentation. It was Exhibit 2 to Mr. Chattoraj's declaration and on slide six.  This is the slide about market fundamentals accelerating demand.

THE COURT:  All right.  Just give me one minute.

MS. WOLKE:  Sure.

THE COURT:  All right.  You can go ahead.  Thank you.

MS. WOLKE:  All right.  And as your Honor acknowledged, when the defendants presented this slide at these conferences in September -- and these were in conferences that were conducted just two and three weeks before the end of the quarter -- demand in pricing were actually declining in the third quarter.  And that late in the quarter, the defendants would have known that.  And so when the defendants put the

KB5LTREO

success of these market fundamentals accelerating demand into play, they had a duty to tell the whole truth about what was going on with market fundamentals, and that is, in the U.S., demand was actually declining during this time period.  And there are a number of Southern District of New York and Second Circuit cases that hold that:  The *JinkoSolar* case, the *E\*TRADE* case, the *Smart Technologies* case.  It's misleading to talk about the positives and the success of market fundamentals like this without, at the same time, disclosing what was going on in a negative way with U.S. demand.

And then the next slide during the September presentations is slide 15.  Again, this is Exhibit 2 to Mr. Chattoraj's declaration.

THE COURT:  Got it.  Thanks.

MS. WOLKE:  Yes.  So, slide 15 is the slide that is titled:  Q2 confirmed the strong performance of Ferroglobe in 2018.  And it's marked by an ascending arrow.  Now, your Honor, at this point in Q3 of 2018, defendants would have known that the company's trend was looking nothing like the arrow was trending.

THE COURT:  And just to be clear, are you challenging the misleading nature of the statement, or just the arrow?

MS. WOLKE:  The statement and the arrow.

THE COURT:  Okay.  All right.

MS. WOLKE:  And both of them because it was omitting

KB5LTREO

the fact that in fact pricing and demands were down in 2018 and that the Q3 was nowhere near trending even online with that ascending arrow.

And as for scienter during this time period, this slide is similar to the *Avaya* case out of the third circuit. And this is on the topic of the proximity to the end of the quarter.  In the *Avaya*, case the defendant made statements about certain impacts on pricing towards the end of a quarter. And the court held there that these statements made two weeks before the end of the quarter, that the defendant was charged with scienter, was charged with knowledge of pricing phenomena during that time.  At this time, when these statements were made on September 4th, the quarter was 70 percent done; by September 12th and 13th the quarter was 80 percent done.  There was only two weeks left.  So they would have known that this strong performance in 2018 was not trending the way that they represented on the slide.

And, again, these topics were of utmost interest to the market in the fallout of the trade case.  So, here, the defendants are giving false comfort to the market that they had dodged the anticipated negative effects of the trade case.

THE COURT:  How is discussion of historical finances necessarily misleading by omission of current or future performance?

MS. WOLKE:  Well, because they're saying Q2 confirms

KB5LTREO

the strong performance of Ferroglobe in 2018, meaning right now as we're presenting this presentation to investors in September, and as we indicate on the arrow trending forward for the end of Q3 2018.

THE COURT:  Right.  But the arrow is -- I just want to make sure I'm reading this right.  The arrow is comparing the second quarter of 2017 to the second quarter of 2018.

So how would a reasonable investor interpret the arrow as making a statement about the future beyond that?

MS. WOLKE:  Well, because the arrow is trending up. So the arrow is suggesting Q3 of 2018, similarly growing over Q3 of 2017, which it didn't.  As we know, Q3 actually dropped almost 50 percent from Q2 2018.  So if this slide was to be an accurate presentation of what was happening at the time, the arrow would not have continued to be ascending past Q2 2018, there would have been a curve back down showing that Q3 was actually trending to be back on par with the Q3 2017 results, not growing.

THE COURT:  All right. You can continue.  Thanks.

MS. WOLKE:  And then moving to the November presentation.  This is Exhibit 5 to Mr. Chattoraj's declaration.  And it's important to note on this presentation, we don't allege scienter from this presentation simply due to proximity with respect to the corrected disclosure.  We allege scienter here because the quarter had already been done for six

KB5LTREO

weeks by the time this presentation was made.  The final results were filed with the SEC two weeks after this presentation was made.

So at the time this presentation is made, they have the Q3 results.  They know what happened during the quarter, and they know what the impact of the trade case was.  So, the first two statements alleged to be misleading in this November 14th presentation on slide 10 and slide 16 -- and both of these slides say the trade case "overhang" -- or the first one says "the trade case overhang has passed," citing corrections to supply, demand and pricing.  And then the next slide that mentions it, slide 16, says "the trade case impact has passed," citing lower inventory stockpiles by end user.

Now, again, your Honor, when they made these statements about the impact of the overhang of the trade case having passed, they, in fact, knew that the impact of the trade case was devastating on the third quarter of 2018.  And --

THE COURT:  Let me ask you.  Elsewhere in this same presentation defendants disclosed declines in the price of silicon metal from February to October 2018, among other negative trends, citing the trade case.

So doesn't the presentation disclose some of the very information that you allege was omitted, namely, the decline in prices in the third quarter of 2018?

MS. WOLKE:  Your Honor, can you tell me which slide

KB5LTREO

you're looking at.

THE COURT:  Yeah.  Sorry.  Let me get it out.  Give me one second.

I think in retrospect, we should have done this on video so we could all screen share.  But just give me one more second to find it.

MS. WOLKE:  No problem.

THE COURT:  I think it was slide 12, but let me just see.

MR. CHATTORAJ:  Your Honor, you are correct.  It's slide 12, which is page 14 of Exhibit 5.  I found it in my presentation.

THE COURT:  That is right.

MS. WOLKE:  So it's a slide coupled with stockpiled inventory, the index slide?  Is that the slide?

THE COURT:  I think it's --

MR. CHATTORAJ:  The title of the slide is:  Historical context for the recent evolution in silicon metal prices.

MS. WOLKE:  I'm there.  Okay.

THE COURT:  Sorry.  I think we're getting confused between pages 14 and 12.  But it's 14 on the docket number on the slide, right?  So --

MS. WOLKE:  Got it.  I'm there now.

And, your Honor, what was the question?

THE COURT:  I was just asking if, given that

KB5LTREO

defendants disclosed declines in the price of silicon metal from February to October of 2018, among other negative trends, doesn't this presentation disclose some of the information that you allege was omitted?

MS. WOLKE:  I don't think it does in any way that was understood by the market, your Honor.  Especially when you look at it in juxtaposition to the very clear statements that are made on slide number 16 and slide number 10, that the overhang had already passed, meaning that -- I think reasonable investors -- and, in fact, the reasonable investor who's believed plaintiffs in this case understood that to mean that the trade case impact did not have a devastating impact on Q3, which defendants admitted two weeks later it did.

So, no, I don't think that that slide in any way changes the misleading nature of the other slides that represented the impact had already passed.

THE COURT:  All right.  You can continue.

MS. WOLKE:  And then the last statement in the November slide was on slide 23.  The statement is:  "Aluminum demand expected to continue delivering steady growth for silicon metal."  And, again, your Honor, this slide is misleading because at this time, which was six weeks after Q3 had ended, the defendants knew, in fact, that the wide availability of aluminum scrap metal in the U.S. was not delivering steady growth for silicon metal; it had actually

KB5LTREO

hurt demand for silicon metal in the U.S.

So, again, when the defendants undertook to comment on positive market forces and market phenomenon driving growth, they had a duty to give a whole story that said, but actually in the U.S. it's having a negative impact on aluminum around silicon metal sales in the U.S.

THE COURT:  But why was Ferroglobe required to disclose its current figures?  I mean, isn't Ferroglobe's performance a separate issue for a demand for aluminum?

MS. WOLKE:  But they were talking about the impact on their sales volume.  So when they were talking about a global phenomenon, they also knew that in the U.S. there was a negative phenomenon.  So that was offsetting the positives that they were describing in the slide.  And, again, under the *JinkoSolar*, and the *E*TRADE*, and the *Smart Tech* cases, when they undertook to put the success of these market fundamentals in play, they had a duty to tell the whole truth.  And that was, in fact, during the third quarter, the wide availability of aluminum scrap in the U.S. was hurting Ferroglobe sales.

THE COURT:  All right.  You may proceed.

MS. WOLKE:  And, your Honor, to touch on scienter, I mentioned this before, the November 14th conference statements are not merely alleged to be made with scienter simply because the results were announced two weeks later, which, by the way, is a fact that supports scienter.  But really the scienter of

KB5LTREO

these statements come into play because they were made six weeks after the quarter end.  They knew the financial results that were coming.  They knew the impacts that the trade case had had on demand and pricing in the U.S., and they knew the impact that the aluminum scrap had had on their product sales in North America.  And these facts alone are sufficient to allege scienter under the *Loreley* case in the Second Circuit which says:  Awareness of undisclosed facts that rendered the company's representations to investors misleading is sufficient to plead scienter.

THE COURT:  But where have you alleged awareness?  I mean, you've alleged in a conclusory fashion that defendants knew or should have known.  But why aren't those allegations just conclusory?

MS. WOLKE:  Well, because by this point, it's six weeks after the quarter end and two weeks before their conference call where they explain exactly what happened.  And, for example, on slide number 16 where they cite that the trade impact has passed and there was lower inventory stockpiles by end users, two weeks later during the conference call, they essentially say at the opposite.  They say, oh, the high stockpiles by end users impactd the Q3 pricing and sales.  And so because quarter was already over by six weeks, these are facts that they would've known by this time.

And then moving on to the September statements, those

are more removed from the corrective disclosure, but the important proximity in time there is their proximity to the end of the quarter.  And, again, they would have known -- going back to the trends slide 15 in the September presentation, by this point when the quarter was 70 percent, 80 percent done, the defendants would have known that Q3 was looking nothing like the arrow was trending on the slide that they presented to investors.

And then, Mr. Chattoraj mentioned core ops, and I think it's clear, we don't rely on core operations alone.  But, again, the importance of the trade case and the impact that it was going to have on Ferroglobe's financial performance throughout 2018 was critical.  The defendants themselves said the trade case outcome was critical when they filed the case.  And then the impact of the trade case in the November 14th slides is listed on one of the slides titled "key messages."

And then the last thing is Mr. Chattoraj mentioned a couple times that we don't allege any insider trading here.  But, your Honor, that, in this case, cannot -- number one, insider trading is not required to allege motive to show scienter.  But here, no inference can be drawn from the lack of these facts because the defendants as foreign issuers are exempt from filing form four.  So we, at this point, not being able to conduct discovery, we couldn't get those facts even if they existed.

KB5LTREO

And then finally, on the points about forward-looking statements or opinions, as your Honor commented closer to the beginning of this hearing, this case is largely a material admissions case. And to the extent that we've alleged these material omissions, the defense cannot avail themselves of this safe harbor and the omissions rubric still applies. Even if these were opinion statements, statement of opinion is still actionable if the speaker omits material information.

So, unless your Honor has anymore questions for me about plaintiff's complaint, those are kind of the core points I wanted to cover today.

THE COURT: All right. And then one question I did have is: You requested leave to amend the complaint in the event that I were to agree with defendants.

How would you amend, if at all?

MS. WOLKE: Well, that's a good question, your Honor. I would have to discuss it with our client and my colleagues. But I think we would attempt to conduct additional investigations.

You know, this is a difficult case, I will admit, because we have a little bit of a vacuum around the statements as they were made. We're not privy right now to the conference call or the transcripts of the presentations. We were not able to find them so far. So it's a little bit difficult, but I do think that we could -- I would appreciate the opportunity to

KB5LTREO

allege more facts if you are inclined to dismiss the case.  But I strongly believe that the facts as alleged are sufficient to state a claim.  And, again, this case should not be dismissed, especially on falsity unless no reasonable investor could have been misled by these presentations.  And, again, here, your Honor, we have a very reasonable informed investor who was misled.  There's a real case in controversy here.

THE COURT:  Okay.  All right.  Thanks very much.

Mr. Chattoraj, do you want to respond to that?

MR. CHATTORAJ:  Yes.  But I will keep it brief, your Honor.

First of all, with respect too the lead plaintiff's alleged reliance on him having been misled, of course, the standard is actually at the motion-to-dismiss stage, not what Mr. Treankler experienced.  I obviously have no way of knowing what his subjective experience was.  The standard is an objective one, and it has to do with whether a reasonable investor, looking at the total mix of information, would be misled.

Your Honor, you focused on the same slide that I had in saying that two slides earlier than the challenged statement, you have a graph that shows prices going down and naming the trade case overhang as the reason for it, among other reasons.  And that's very consistent with the disclosures that were made in connection with the quarter.

With respect to the temporal issue, I would simply say that we cited cases in our brief, for example, I call your Honor's attention to *Police and Fire Retirement Systems* and *Acito v. IMCERA Group*, which are cited on page nine of our reply brief in response to the opposition to the initial motion to dismiss, where we show that, you know, the fact that the fiscal quarter had ended weeks prior to November presentation does not in and of itself show scienter. Again, this is a large multinational company. North American silicon sales are not even the bulk of the business of Ferroglobe. And it's not reasonable under the case law -- it's not reasonable to draw the inference based on that conclusory allegation alone, that the individuals had scienter.

With respect to the alleged misrepresentations concerning aluminum demand expected to continue delivering steady growth for silicon metal, I note that this slide appears as part of the November 14th presentation's section on medium term outlook for silicon metal. That is page 22 of the docket document and it is the title prior to slide 21.

So to the extent that we're talking about any factual matter that could be derived from these representations, these are not being focused on third-quarter 2018, which, as plaintiff acknowledges, the fiscal quarter had already ended at that point. So this is not like a short term outlook, is my point.

KB5LTREO

Now, with respect to the September presentations, it's undisputed that this was during the quarter, and it's completely consistent with all known information that existed at that time.  And I would note in that context, as Ms. Wolke said, there had been this ITC issue, and subsequent to -- by the way, all of this is entirely prior to the class period.  But just to engage with those factual allegations for a moment, on May 22nd, 2018, Ferroglobe issued its first quarter 2018 results, and they were, you know, with some exceptions, broadly positive.  And they showed an increase relative to the prior quarter, the fourth quarter, of 2017, and also an increase over the first -- the first quarter of 2017.  On August 21st, 2018, which was, you know, a few weeks before these presentations, Ferroglobe issued its earnings press release for the second quarter of 2018.  And the second quarter results were also -- again, broadly speaking -- positive.  So the statements that were being made about 2018 performance at the time of the September presentations were true.  And this goes back to my falsity point.

But even with respect to November 14th, 2018, I just want to note, in each of these cases, the quarterly results were reported a couple of months or more after the close of the fiscal quarter's question.  So this is completely consistent.  There's no scienter that you can derive from the time that passed between the end of the fiscal quarter and of the

quarterly reporting. And, again, you know, when you're gathering information and putting it together to make a quarterly report, I would simply say that, in the absence of some specific allegation that, you know, goes to the question about knowledge or awareness, you can't just infer knowledge under the PSLRA, which requires the pleading of specific fact that gives rise to a "strong inference of scienter."

And that's one of the reasons why I think the cases that have been cited are not on point. For example, in the *JinkoSolar* case, you had allegations of specific knowledge by the senior officers with respect to this hedge fund that was allegedly undermining results -- or undermining performance. And, you know, you don't have anything like that here, except for in the conclusory fashion saying, they would have known or they must have known. And as your Honor heard, Ms. Wolke said exactly that repeatedly during this argument.

I understand that they believe that, if given more discovery and the opportunity to amend once again and put Ferroglobe to the cost, expense and uncertainty of continued litigation, if they go on a fishing expedition, they may believe that they can find something. You know, I don't think that they've sort of established a factual basis for that kind of information, certainly in admissible form in this case. And I don't think it would be appropriate to give them yet another opportunity to amend. I mean, they have, of course, already

KB5LTREO

amended once as of right.

Does your Honor have any questions for me?

THE COURT:  No.  Thank you.

All right.  I will reserve decision.  But thank you all for your advocacy today.  And take care.

MS. WOLKE:  Thank you, your Honor.

MR. CHATTORAJ:  Thank you very much, your Honor.

******